No. 46,402

OLIVER C. SUMMERS and ECIL L. SUMMERS, *Appellees,* v. THE AL-
LIANCE MUTUAL CASUALTY COMPANY and HARLEY SAMUELSON,
*Appellants.*

(499 P. 2d 1067)

Opinion filed
July 19, 1972.

*Thomas C. Boone,* of Hays, argued the cause and was on the brief for the appellant, Alliance Mutual Casualty Company, Wallace and Mulch, of Scott City, joined in his brief for the appellant, Harley Samuelson.

*Dennis L. Bieker,* of Dreiling and Bieker, of Hays, argued the cause, and *Norbert R. Dreiling,* of the same firm, was with him on the brief for the appellees.

The opinion of the court was delivered by

FOTH, C.: This is a wrongful death action brought by the parents of Bobbie Dean Summers, who was nineteen years old when he was killed. The defendants were Harley Samuelson, the youthful driver of an unregistered and uninsured vehicle which struck Bobbie, and Alliance Mutual Casualty Company, which had written uninsured motorist coverage on three automobiles owned by plaintiffs under which Bobbie was an "insured."

The case was tried to a jury which returned a verdict in the form of answers to special questions. On the basis of these answers

judgment was rendered for plaintiffs in the sum of $21,976.54, and the defendants appeal. Several questions are raised, but the dispositive one turns on the trial court's handling of the doctrine of "last clear chance." Its discussion requires a brief review of the evidence.

On the evening of January 20, 1968, Bobbie Dean Summers went from his home in Grainfield to a wedding dance in Park, some six or eight miles east of Grainfield. He was wearing black shoes, black pants and a dark overcoat. At the dance he met Leo Schoenberger, a young man from Oakley who, with two friends (the Sporing brothers), was attending the dance uninvited. When the dance broke up shortly after midnight Bobbie accepted a ride home with his new acquaintances, but the group stopped first at the Co-op in Park to use its rest room facilities. There a quarrel broke out between Schoenberger and one of the Sporing boys, and Schoenberger decided to walk home. He struck out afoot, and Bobbie tagged along. One of the Sporings said they had a bet as to which would reach Grainfield first.

The pair proceeded south to old Highway 40 and turned west toward Grainfield, walking along the north shoulder. They were thus going with traffic, not facing it as the statute required. (K. S. A. 1968 [now 1971] Supp. 8-557a.) Their relative positions shifted at first, but Schoenberger testified that after a quarter mile or so he commenced to trot, and Bobbie followed suit. According to Schoenberger he had built up about a 100 yard lead when he heard a car approaching from behind and then heard a thud like a thrown tire-recap hitting a fender. The car slowed and then speeded up and disappeared to the west. Schoenberger looked back, didn't see Bobbie, and took off to the west running. He was picked up another three-fourths mile west by the Sporing boys, who happened to pass by.

The driver of the fatal car was the defendant Harley Samuelson. He had looked in on the dance in Park after attending a teenage dance in Collier. He left Park shortly after midnight and headed west in his 1958 Ford, which he had purchased the previous October with a "blown" engine. During the intervening months he had replaced the engine and generally overhauled the car, but had never transferred the title or registered it. He was using a borrowed tag on the night in question. According to him the car was in good shape mechanically except for the speedometer; he relied on a tachometer for a speed indicator. He had test-driven the car 50 to 100

miles prior to this night. The battery and electrical system were in good condition and the lights operated normally.

As he went west from Park he met a car coming east. He described the ensuing events in these words:

"Well, when I left, or met that car, I remember checking my tachometer and dimming my lights, and the tachometer registered approximately 2200 and from previous calculations, it was close to 60 miles an hour. Then I had the radio on, and I was driving down the road there, and it was dark, but I saw this figure moving in the ditch. I don't know where it came from, and it really startled me because, you know, I couldn't figure out what a person would be doing out there on the highway at that time of night. I took my eyes off of the highway momentarily, and when I looked back there was this thud, and I saw a human go up and over my right fender, and I felt it hit my windshield and go off the side of the car there. This really scared me because I recognized that it was a human figure, and I didn't know what to do. I didn't know whether it was somebody that was after me, or whether I really hit somebody. You just don't know what to think. I panicked and I was scared, and I slowed down debating what to do, then fear got the best of me, and I just took off to go back to Oakley."

Harley later surrendered to the authorities and eventually pleaded guilty to leaving the scene of an accident and the unlawful possession of another's license plate.

Bobbie was found about 1:00 a. m. by a passerby who noticed his shoe on or near the roadway; Bobbie was in the north ditch fourteen feet from the pavement, and was taken to a hospital where he died of his injuries later that morning.

Just where Bobbie was when he was hit is disputed. Harley was positive he never left the roadway, and the asphalt at the edge was broken and chipped so as to shake a car driven over it. Sheriff's officers investigating the accident were unable to locate the exact point of impact. They located a shoe two feet onto the pavement and the heaviest concentration of broken glass was two to four feet from the pavement's edge; no glass was found on the shoulder. In our view it is immaterial whether he was on the pavement where all the physical evidence indicates or on the shoulder where plaintiffs suggest.

In its instructions the court summarized the contentions of the parties as to negligence, contributory negligence and the burden of proof without objection. It then gave, over defendants' objection, the following:

"No. 11

"The plaintiffs have alleged as a basis for recovery against the defendants, the doctrine of Last Clear Chance. Before the plaintiffs can recover under this particular doctrine, the following elements must be established:

"(*a*) That Bobby Dean Summers, by his own negligence placed himself in a position of peril from which he could not extricate himself.

"(*b*) The defendant Harley Samuelson saw Bobby Dean Summers in a position of danger, or, in the exercise of ordinary care should have seen Bobby Dean Summers in such position, and by the exercise of ordinary care could have avoided injuring Bobby Dean Summers.

"(*c*) The defendant Harley Samuelson failed to exercise such ordinary care.

"(*d*) As a result of such failure on the part of Harley Samuelson, Bobby Dean Summers was injured.

"If all of the conditions just mentioned are found by you to have existed with respect to this occurrence in question, then under such conditions the law holds the defendants liable for any injury sustained by Bobby Dean Summers as a direct result of the occurrence, despite any contributory negligence of Bobby Dean Summers."

This was followed by instruction No. 12 on the special questions to be answered, No. 13 defining proximate cause and No. 15 defining contributory negligence. All of these instructions were substantially identical to their counterparts set out verbatim in *Rohr v. Henderson,* 207 Kan. 123, 124-25, 483 P. 2d 1089, where they were numbered respectively 9, 10, 11 and 13.

In addition, the first five "Special Questions and Special Verdicts" were likewise those used in *Rohr,* modified to fit the present parties:

"1. Do you find from a preponderance of evidence that at the time and place of the collision the defendant Harley Samuelson was negligent in a manner alleged in plaintiffs' petition, which was a proximate cause of the collision?
"ANSWER: Yes
   "(Yes or No)

"2. If you answer the foregoing question 'yes', then state the act or acts of Harley Samuelson that constituted such negligence.
"ANSWER: Failure to keep a proper lookout for other persons on or near said highway, and particularly the deceased, Bobby Dean Summers.

"3. Do you find from a preponderance of evidence that at the time and place of the collision that Bobby Dean Summers was negligent in a manner alleged in the defendant's answers, which was a proximate cause of the collision?
"ANSWER: Yes.
   "(Yes or No)

"4. If you answer the foregoing question 'yes', then state the act or acts of Bobby Dean Summers that constituted such negligence.
"ANSWER: Failure to keep and maintain a proper lookout for his own safety.

"5. Do you find from a preponderance of evidence that the defendant Harley Samuelson had the 'Last Clear Chance' to avoid the collision as that term is defined in Instruction No. 11?
"ANSWERS Yes.
   "(Yes or No)"

Only the sixth question varies from that used in *Rohr.* Here the jury was to fix damages only if its answers to the other questions

indicated a plaintiff's verdict, while in *Rohr* the jury was required to do so regardless of its answers to the other questions.

We thus have the identical problem which led this court to reverse a plaintiff's judgment in *Rohr*. The instruction on contributory negligence included the ingredient of proximate causation, and the jury's answer to question No. 3 convicted the decedent of contributory negligence which was a proximate cause of his injuries. The instruction on last clear chance, albeit given before our decision in *Rohr*, made the same reference to *contributory* negligence that we specifically disapproved in *Rohr*. (See Syl. ¶ 4.) We there concluded (p. 129):

"Despite any intention on the part of the jury as to who should prevail, the judgment must be reversed because of the clear finding that appellee's negligence was a proximate cause of the collision, and we so hold."

The same disposition might well be made of this case, but here the court is of the opinion that an instruction on last clear chance should not have been given at all.

In *Rohr* we reviewed the elements of the doctrine (which were fairly summarized by the trial court here in parts (*a*) through (*d*) of its instruction) and quoted the explanatory statement in *Letcher v. Derricott*, 191 Kan. 596, 600, 338 P. 2d 533:

"The use of the phrase 'that plaintiff's negligence had ceased' has caused some confusion. The phrase means, and perhaps the better term is, 'that the plaintiff had, by her own negligence, placed herself in a position of peril from which she could not extricate herself.' If the plaintiff could extricate herself from the danger, and did not do so, her negligence had not ceased. If the plaintiff could not extricate herself from the danger, her negligence had ceased."

We further noted the similar statement in *Sander v. Union Pacific Rld. Co.*, 205 Kan. 592, 470 P. 2d 748:

"A fundamental principle of law is that the last clear chance doctrine is inapplicable where plaintiff's contributory negligence continues and is not shown to have ceased. As sometimes stated, there can be no recovery under the doctrine where the negligence of the parties has remained concurrent. [Citations.]" (p. 598.)

We likewise approved the analysis of the relationship between negligence and causation under the doctrine found in *Ross v. Chicago, R. I. & P. Rly. Co.*, 165 Kan. 279, 286, 194 P. 2d 491:

"The doctrine of last clear chance is not applicable so long as the plaintiff's contributory negligence continues. Otherwise stated, there can be no recovery under the doctrine where the negligence of the parties has remained concurrent. [Citations.] The reason for this rule is readily apparent when the ques-

tion is considered from the standpoint of proximate cause. Approaching the doctrine from that point of view as many, but not all, courts do [Citations], where a plaintiff's negligence has ceased, it is regarded as remote and the defendant's negligence which *thereafter* follows is regarded as the proximate cause of the accident. It is thus clear that if the plaintiff's negligence has continued until the time of the accident and, without such negligence, the accident would not have occurred, recovery cannot be had."

In this case it is clear that Bobbie was going with traffic, at night, wearing dark clothes; these acts of negligence were beyond his power to correct when Harley's car approached. But, as the jury found, he also failed to keep a proper lookout for traffic. It is true that Harley said he could have avoided Bobbie if he had seen him, but it is equally true that Bobbie could have avoided injury had he seen the approaching car at any time until the moment before it struck him—a time when Harley would likewise have been helpless even if he had seen Bobbie. The record fails to disclose any evidence from which the jury could reasonably find a time when Bobbie's negligence had ceased and Harley's thereafter continued.

Thus, as we view the evidence, there was never a time when the negligence of the parties was not concurrent; *i. e.*, when Bobbie was in a position of peril from which he could not have extricated himself had he exercised due care. It was therefore improper to submit the theory of last clear chance to the jury. *Sander v. Union Pacific Rld. Co.*, supra.

What we have said renders unnecessary a discussion of the other issues raised, and as to them we intimate no opinion. In view of the jury's finding that the decedent was guilty of contributory negligence the judgment is reversed and the case remanded with directions to enter judgment for the defendants.

APPROVED BY THE COURT.